FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**   2015 JAN 20  PH 5: 06

CLERK'S OFFICE
AT BALTIMORE

| | | |
|---|---|---|
| AARON SLOAN, # 339875 | * | |
| | * | Civil Action No. JKB-13-3843_____DEPUTY |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| OFFICER J. LEE, et al. | * | |
| | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM

Pending is Aaron Sloan's ("Sloan") complaint filed pursuant to 42 U.S.C. § 1983. (ECF 1, 3, 23, 26). Defendants Sergeant Christopher Bingaman, Correctional Officer II Clinton T. Davis, Lieutenant William Gordon, Jr., Correctional Officer II Ryan Harper, Correctional Officer II Jason W. Lee, Correctional Officer II Codey K. Linn, Correctional Officer II Cody Miller, Correctional Officer II Jeremy Snyder, Warden Richard J. Graham, Jr., the Division of Corrections, and Western Correctional Institution, by their counsel, have filed a motion to dismiss or, in the alternative, a motion for summary judgment (ECF 34) to which Sloan has filed an opposition. (ECF 38).

The case is ripe for disposition. After considering the pleadings, exhibits, and applicable law, the court now rules pursuant to Local Rule 105.6 (D. Md. 2014), as a hearing is deemed unnecessary. For reasons to follow, the Division of Corrections, Western Correction Institution, and Warden Richard J. Graham ARE DISMISSED as defendants, and summary judgment IS GRANTED in favor of the remaining defendants.

## BACKGROUND

### I.   Procedural History

Sloan, a self-represented litigant, presents claims of Eighth Amendment violations for use of excessive force, failure to protect, unlawful conditions of confinement, and deliberate indifference to his serious medical needs.[1]   He also alleges he has been subjected to retaliation for filing administrative claims and lawsuits and his legal mail was unlawfully confiscated.[2]

Sloan filed this complaint on December 20, 2013, initially presenting claims arising from a use of force incident that took place at Western Correctional Institution ("WCI") on November 11, 2013.[3]   (ECF 1).[4]   He later presented claims arising from an incident on December 25, 2013, when he was found with contraband and the subsequent removal of his in-cell wheelchair and his placement in a double inmate cell without handicap accommodations.

Sloan alleges on November 11, 2013, Officer J. Lee sprayed him with "mase" in his cell for no reason.   He alleged Officer C. Linn sprayed him with "mase" two more times, choked him, and called him a "snitch."   *Id.*   He also alleged Officer Swagger refused to give him his

---

[1]   Sloan asserts Officer Linn violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA") when "he placed his hands on me in an assault [sic] manner and caused me pain by pushing my head until I became dizzy and passed out." (ECF 3, p. 7.)   Sloan does not explain why he believes these alleged actions violated the ADA, and his claim will be dismissed for failure to state a claim.   Sloan's allegations, however, will be addressed in the context of an Eighth Amendment excessive force analysis.

[2]   Insofar as Sloan may intend to raise a claim concerning the delivery of legal mail on December 4, 2013, the subject of an Administrative Remedy Procedure request ("ARP"), # WCI-203313 (ECF 34, Ex. 8, 6), he fails to allege actual injury.   His claim is dismissible on this basis.   Defendants' exhibits demonstrate Sloan initially refused to comply with security protocol for receiving mail. (ECF 34, Ex. 9).

[3]   On November 15, 2013, Sloan filed ARP #WCI-188613, complaining about the November 11, 2013, incident. The ARP was dismissed for procedural reasons as the matter had been assigned to the Internal Investigation Unit ("IIU") Case Number 13-35-01571. (ECF 34, Ex. 8 pp. 4-5).   Neither the IIU report nor its conclusions have been provided to the court.   The November 11, 2013, incident, however, was addressed in IIU 13-35-0013, which is part of the record in the instant matter. *See infra* pp. 9-11.

[4]   Sloan was an inmate at WCI when he filed the Complaint.   He is presently incarcerated at the Anne Arundel County Detention Center.

legal mail. *Id.* As Sloan's complaint was incomplete, the court directed him to supplement the complaint using court-provided forms.[5]

On January 23, 2014, Sloan supplemented the complaint. (ECF 3). He claimed pepper spray was used against him by Officer Lee "for no reason" on November 11, 2013, and caused him to be unable to breathe. (ECF 3, pp. 4, 6). Sloan claimed Officer Lee acted with deliberate indifference as he "clearly expressed" to Officer Lee that he had asthma, suffered seizures, and was unable to breathe. (ECF 3, p. 8).

Additionally, Sloan complained he was placed in a cell without modifications to accommodate his wheelchair[6] after the November 11, 2013 incident, officers were "threatening" him, and he was in imminent danger of harm. (ECF 3, pp. 4, 6). As relief, he requested the termination of the officers who participated in the use of force incident, damages, and transfer to another correctional facility.[7] (ECF 3).

On March 4, 2014, the court issued an order to obtain service on defendants, and service was accepted by counsel on behalf of Officers J. Lee, Davis, and C. Linn. (ECF 6, 7, 9). Since then, Sloan has filed numerous papers, letters, and supplements.[8]

In a letter dated March 25, 2014, Sloan alleged Davis on March 24, 2014, came to his cell, confiscated his medication, and broke his razors. Sloan averred he has been threatened by Davis, Lin, and Lee for "writing them up" and Davis planted contraband on him. He asked to be transferred to a different correctional facility. (ECF 10). On April 3, 2014, the undersigned sent

---

[5] Sloan's original complaint referenced several pages, but consisted of only one page. (ECF 1).

[6] Sloan has a history of back injuries due to "a slip and fall," an injury to the lumbar spine, and weakness in his lower extremities. (ECF 28, p. 2; ECF 34. p. 25).

[7] Sloan's transfer to another correctional facility moots his request for injunctive relief. *See supra* n.4.

[8] The court has liberally construed Sloan's numerous *pro se* filings containing claims based on incidents that occurred at different times and involved different parties.

the letter to the Office of the Attorney General for appropriate investigation. (ECF 10, 11). On April 23, 2014, counsel responded, attaching a letter from Warden Graham. The letter indicated that on March 24, 2014, Sloan's cell was searched and 19 unauthorized pills were discovered. Sloan was given an adjustment hearing and found guilty of a rule violation by a hearing officer. Graham's letter read in part:

> After an empirical review of the case I am confident this cell search was performed in accordance with policy. Mr. Sloan's allegation he is being set-up by Officer Davis is unfounded. This allegation was investigated by IIU and found to be without merit…

(ECF 14).

Sloan thereafter filed numerous additional supplements and correspondence. In his letter dated April 9, 2014, Sloan claimed that he had been tortured for fourteen days in a non-handicap accessible cell without his wheelchair.[9] (ECF 10, p. 2.) In that letter and in his March 25th letter, he complained:  1) he had difficulty using the toilet because there were no grab bars; 2) Officer Wilburn choked him and pushed him out of his wheelchair; 3) Davis, Linn, and Lee threatened him; and 4) Davis planted contraband on him (ECF 10). Sloan claimed he was falsely accused of giving away his medicine, and as a result, his medication was confiscated and he wrongfully was issued a rule violation. (ECF 10, 13). Lastly, he suggested that he was denied medical care by Detective Gordon. (ECF 10, p. 2).

On April 16, 2014, the court directed counsel for the Division of Corrections to file an expedited response to Sloan's request for injunctive relief and address his claims that he had been tortured for fourteen days in a cell without accommodations for his wheelchair, he was

---

[9]  Sloan later also asserted that he went without a mattress between March 25, 2014, and April 10, 2014. (ECF 15, pp. 1-2).

pushed out of his wheelchair by a corrections officer, he was deprived of his wheelchair, he was choked by Officer Wilburn, and he was deprived of medical care. (ECF 12).[10]

On April 17, 2014, Sloan submitted another letter to the court. (ECF 13). He alleged he had sustained additional injuries while trying to navigate his cell without a wheelchair. He stated he was found guilty of the rule violation at a hearing he did not attend. *Id.* He stated he had not received a response to his sick call requests, and maintained correctional and medical staff were conspiring.

On April 23, 2014, counsel for the Office of the Attorney General filed investigatory findings concerning Sloan's March 25, 2014, correspondence to the court. (ECF 10, 14).

On May 14, 2014, counsel filed an expedited response (ECF 22) to Sloan's request for emergency injunctive relief to which Sloan replied with a declaration from his cellmate, Antonio Banks, who attested to witnessing the difficulty Sloan has had navigating a cell without accommodations. (ECF 28).

Sloan supplemented his complaint again on May 16, 2014, to name additional defendants and alleged he was afraid cellmate Milton Savoy would kill him and that he had open wounds on his head and knees from crawling and hitting his head in his cell due to his lack of a wheelchair (ECF 23).

On June 5, 2014, Sloan filed another supplement, this time in the form of an affidavit. In it, he alleged Officer Davis smashed his head against a strip cage in retaliation for filing a "prison grievance." (ECF 26, p. 4). Sloan avers the right side of his face was swollen for ten days. Additionally, he generally reiterated his earlier presented allegations of fact.

---

[10]   To the extent plaintiff intends to claim medical providers provided him with constitutionally inadequate care, he may present his claims in a separate civil action. The court expresses no opinion in regard to the merits of such a proceeding.

On August 5, 2014, defendants filed a motion to dismiss or, in the alternative, motion for summary judgment (ECF 34).[11]

## II.   Defendants' Expedited Response

The court-ordered expedited response to Sloan's claims and exhibits are summarized as follows.

### Declaration of Dr. Colin Ottey

Dr. Colin Ottey ("Ottey"), a physician who has treated Sloan, attests:

1) Sloan "needs a wheelchair to travel longer distances throughout the housing unit and institution" in general, but not while housed in his cell (ECF 22, Ex 2 ¶ 6);

2) Sloan has a "well-documented history" of using his wheelchair to break his cell window;

3) Sloan's Neurontin[12] prescription was discontinued because he was hoarding medication and giving it to other inmates;

4) On April 9, 2014, Dennis Martin, R.N., saw Sloan in the medical department for complaints of a left knee abrasion due to falling. Martin observed a small open abrasion;

5) On April 10, 2014, medical providers requested a physical therapy assessment for Sloan. Ottey informed Sloan that his medication would be provided to him crushed and floating in water in light of allegations that Sloan was selling his medicine;

6) On April 11, 2014, medical staff observed Sloan throw himself toward the cell door to receive his medicine, hit the right side of his head, and land on the floor. Sloan was evaluated by medical staff who observed no bruising, bleeding, or swelling. It was determined there was no medical necessity to remove him from his cell. (ECF 22, Ex. 2 ¶ 9);

7) On April 19, 2014, Sloan was seen by medical providers for reported injury to his knees, lip, and head. Lisa Shell, R.N., examined Sloan and observed superficial skin injuries which were cleaned, treated with antibiotic ointment, and bandaged. There were no open head wounds. Sloan's lip was slightly swollen; and

---

[11]  On July 22, 2014, Sloan submitted a declaration (ECF 33) concerning a July 12, 2014, incident during which he alleges he was attacked by other inmates and accused of throwing feces. If he wishes to pursue claims based on new allegations, he may file a separate complaint.

[12]  Neurontin is a medication used to treat seizures and nerve pain. (ECF 22, Ex. 2 n. 1).

8) On April 22, 2014, Sloan went to the medical unit complaining he had suffered a seizure the previous night, is not assigned to a handicapped accessible cell, and is having difficulty pulling himself upon the toilet. He also claimed that he was not receiving all his seizure medications. Ottey prescribed Gabapentin[13] with for Sloan.

## Notice of Inmate Rule Violation

On March 24, 2014, Sloan received two notices of rule violations. In the first, Sloan was notified that contraband was found during a search of his cell. Specifically, corrections officers found 19 pills, 3 intact razors, and "numerous broken razors." The officers also observed damage indicating tampering on the right side of Sloan's wheelchair. As a result, Sloan was charged with violating institutional rules 105 (possession of a weapon or article modified into a weapon), 111 (possession or use of medication that could be used as an intoxicant), and 406 (possessing, passing, or receiving contraband). (ECF 22, Ex 3, pp. 17, 20-22). Sloan refused to attend his disciplinary hearing on March 26, 2014. When Officer Wilburn whether he wanted to go to the hearing, Sloan, who was seated in his wheelchair, replied "fuck that hearing." *Id.* at 25. The hearing officer held the hearing without Sloan, and found him guilty of all three rules charged. *Id.* at 28. Sloan received 180 days of segregation for violating rules 105 and 111, and 45 days of segregation for violating rule 406. *Id.* at 29.

Also on March 24, 2014, Sloan was issued a second rule violation for passing medication to another inmate out of a hole under his cell door. Sloan was charged with violating rules 111 and 406, found guilty, and sanctioned with 45 days of segregation. (ECF 22, p. 42).

On March 28, 2014, Sergeant Bingaman heard a loud banging and discovered Sloan's cell window was shattered and he was unresponsive on the floor of his cell. Sloan was taken to

---

[13] Gabapentin is a drug prescribed to treat seizures. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds.

the infirmary for treatment, and later charged with violating institutional rules 100 (disruptive activity) and 116 (damaging or destroying property). (ECF 22, Ex 3, pp. 3, 6-9).

On April 1, 2014, Sloan refused to be handcuffed to attend his disciplinary hearing and "waived" Officer Logsdon away. *Id.* at 10. Sloan was informed the hearing would proceed without him. *Id.* The disciplinary hearing was held on April 1, 2014, and the hearing officer concluded:

> Inmate refused to appear. HO [hearing officer] finds good cause to hold hearing in abstentia [*sic*]. HO finds the report credible and reliable. Sloan regularly breaks his cell window. HO finds inmate guilty of rule 116. Rule 100 is not supported or explained in the violation.

ECF 22, Ex. 3, p. 13). The Hearing Officer indicated he would sanction Sloan by deducting 300 good conduct credits but there were no good conduct credits on his record to subtract. *Id.* at 14.

### Wheelchair Destruction Documentation

On March 31, 2014, Lieutenant William Gordon ("Gordon") advised Chief of Security Michael Thomas ("Thomas") by memorandum that on March 28, 2014, Sloan had used parts of his wheelchair to break his cell window. Gordon wrote "[t]his is the third occurrence of the same type of destruction from inmate Sloan." (ECF 22, Ex. 4, p. 2).

On April 8, 2014, an "institutional wheelchair inspection" revealed that Sloan's wheelchair was beyond repair and missing several pieces "due to inmate Sloan using the parts to break out cell windows." (ECF 22, Ex. 4, p. 3). It was decided to send the wheelchair to the repair shop to be used for parts. *Id.*

### Declaration of Michael Thomas, WCI Chief of Security

Thomas attests he conferred with Director of Nursing Janice Gilmore, and learned the medical department could not find an order for Sloan to keep a wheelchair in his cell. (ECF 22, Ex. 5). Thomas states "[m]edical personnel who have noted that he [Sloan] requires the use of a

8

wheelchair for mobility to travel longer distances throughout the housing unit and institution, in general, have routinely evaluated Mr. Sloan." *Id.* at 3. Based on this information, Thomas determined that Sloan should no longer be permitted a wheelchair inside his cell. *Id.* "At no time since providing this order have correction personnel been advised by the medical department that Mr. Sloan require [sic] the use of a wheelchair inside the cell." *Id.*

### IIU Investigation

On April 24, 2014, WCI Captain Bradley Butler contacted the Department of Public Safety and Correctional Services Internal Investigation Unit ("IIU") in regard to Sloan's assault claims. According to counsel, the investigation was assigned number CIR # 14-35-00420[14] and on April 25, 2014, Detective Rodney Likin ("Likin") was assigned to the case. (ECF 22, p. 10). Likin went to WCI to assess Sloan's safety and welfare concerns. After interviewing and photographing Sloan,[15] obtaining his medical documents, and interviewing staff, Likin provided a preliminary report to counsel that found Sloan did not appear to be in imminent danger. (ECF 22, p. 10).

Counsel summarized Likin's findings as follows:

Detective Likin had Mr. Sloan evaluated by medical staff. The nurse conducting the evaluation noticed that Mr. Sloan was bleeding from his knee. She concluded that the injury was old and noted that it appeared that the scab had been removed causing the bleeding. Officer Fontaine was interviewed and denied dumping Mr. Sloan out of the wheelchair. He stated that he wheeled Mr. Sloan back to his cell and Mr. Sloan moved from the wheelchair to the toilet, without assistance, and he then left Mr. Sloan's cell with the wheelchair.

Lieutenant Likin also reported that on March 28, 2014, Mr. Sloan used parts of his wheelchair to crack the back window and the door window of his cell. While

---

[14] Defendants have not provided a copy of CIR # 14-35-00420 to the court. In support of their Motion for Summary Judgment, Defendants have filed IIU report CIR # 14-35-00013, which addresses Sloan's allegations arising from the November 11, 2013, use of force incident and December 25, 2013 wheelchair search incident. (ECF 34, Ex. 10).

[15] Sloan asserts that he "was never seen by IIU." (ECF 26 p. 5).

inside Mr. Sloan's cell, Detective Likin also observed that there were several items laid out on the top bunk bed. Because Mr. Sloan is single celled, Detective Likin inferred that Mr. Sloan stood up to lay those items on the top bunk. Dr. Ottey has requested physical therapy for Mr. Sloan and noted that he does not need a wheelchair in his cell. However, Mr. Sloan should use a wheelchair outside of the cell when traveling long distances. Detective Likin's observation of Mr. Sloan's cell also revealed the presence of a "fishing line" made of torn bed sheet tied together. He stated that the line's use is to send items to other cells and inmates. Detective Likin further stated that over the past several weeks, several inmates have been found passed out in their cells and advised the medical department that they had taken Neurontin. The only inmate to whom this medication is prescribed on the unit is Mr. Sloan. Therefore, Detective Likin stated that [it] is likely that Mr. Sloan provided those inmates with the medication.

(ECF 22, pp. 10-11).

According to counsel, Likin also reviewed Sloan's medical records and learned that he had been seen in the medical department 19 times between March 5 and April 25, 2014. (ECF 22, p. 10). Counsel indicated Sloan's claim he was choked by Officer Wilburn was under investigation by the IIU. (ECF 22, p. 18).[16]

### III.   Exhibits filed in Support of Motion for Summary Judgment

The following verified exhibits and declarations were submitted by Defendants with their Motion for Summary Judgment.

IIU Investigation Report CIR 14-35-00013

On January 31, 2014, Detective Rodney Likin ("Likin"), met with Sloan to investigate allegations that on December 25, 2013, Officers Davis, Snyder, and Harper forcibly removed Sloan from his wheelchair and "smooshed" his face against a cage before throwing him to the ground. (ECF 34, Ex. 10, p. 10).

---

[16] The results of the IIU report concerning Sloan's allegation that he was choked by Wilburn have not been made known to this court. As Wilburn has not been served and is not a party to this action, Sloan may raise his claim against Wilburn by filing a separate complaint. The court expresses no opinion as to the merit of this claim.

Likin also questioned Sloan about the November 11, 2013, use of pepper spray incident. Sloan explained he "was kinda knocking on the door to get someone's attention, and then Officer Lee comes to my door, drops the slot, and pepper sprays me for no reason." (ECF 34, Ex. 10, p. 3). Sloan acknowledged knocking on the door with the leg of his wheelchair, but "wasn't beating on the door." *Id.* Sloan stated he could not remember why he was knocking on the door. *Id.*[17] Sloan acknowledged receiving medical attention for pepper spray exposure. *Id.* When asked if he has had any problems with Officer Lee since then, Sloan answered, "No, not yet." *Id.*

Likin interviewed Officer Lee who stated that on November 11, 2013, Sloan was striking his cell door with the leg of his wheelchair. Lee applied one short burst of pepper spray to Sloan. Lee was off duty on December 25, 2013. (ECF 34, Ex 10, p. 5). Lee stated he has had no other problems with Sloan. *Id.*

In regard to the December 25, 2013, incident, Sloan told Likin:

> I was in my cell and rolled over by the window to look outside. I bumped the heater cover with the leg of my wheelchair and it fell on my foot. The cover was so heavy it dumped me out of my wheelchair but was still on my foot. I started yelling for help and Officers J. Snyder and C. Miller lifted the cover off my foot and put me back in my wheelchair. They pushed me around to the cage in the property room and Nurse Zacot looked at my foot. She said she was going to put me in for an x-ray. When she left, Officer Miller, Snyder, Harper, and C. Davis told me to stand up and strip. I didn't listen to them so they came in the cage. It even left a cut on my face. Then they threw me to the ground and searched my wheelchair.

*Id.* Sloan said the officers' search of the wheelchair revealed a radio, headphones, and "some other stuff." *Id.* When asked what the other stuff was, Sloan said, "I don't know. The Officers said it was parts from the heater or something." *Id.*

---

[17]   Sloan told the investigator that Officer Davis then took him to a room and administered pepper spray again. (ECF 1, p. 4, ECF 3, p. 4).

Likin asked whether Officer Davis was the only one who pushed Sloan's face into the cage, and Sloan responded, "He [Davis] was the only one pushing my head but Harper and Snyder threw me on the ground." *Id.* In response to questioning about his injuries, Sloan stated there was "[n]othing serious, but I was sore all over." *Id.*

Likin next interviewed Officer Jeremy Snyder ("Snyder") who stated that on December 25, 2013, he found Sloan on the floor of his cell with the metal cover of his cell heater on his foot. (ECF 35, Ex. 10, p. 6). Snyder and Officer Miller entered the cell, removed the heater cover from Sloan's foot, and placed him back in his wheelchair. Snyder noticed metal had been removed from the heater, so Sloan was taken for a strip search. After Sloan was secured in the strip cage, he removed his clothing but refused to get out of the wheelchair. Snyder stated that he and Officers Harper, Miller, and Davis entered the strip cage and removed Sloan from his wheelchair so that it could be searched. *Id.* Snyder said the officers laid Sloan on the floor, and denied anyone pushed Sloan into the cage. *Id.* Snyder stated he has had no other problems with Sloan.

Officer Clinton Davis told Likin that he saw Officers Snyder and Miller bring Sloan to the strip cage in the property room. Davis said he thought Officer Harper picked Sloan up and laid him on the floor so that the wheelchair could be searched. (ECF 34, Ex. 10 p. 7). Davis said that he recovered a radio, headphone, and parts from the radiator in the cell. (ECF 34, Ex. 10. p. 7).[18] When asked whether he assisted in removing Sloan from the wheelchair, Davis answered "No, there is no way three officers and an inmate in a wheelchair could fit in the cage." *Id.* Davis denied he or any other officer pushed Sloan's face into the cage. Davis denied assaulting Sloan or witnessing anyone doing so. *Id.*

---

[18] Inmates on disciplinary segregation, as Sloan was at the time of the search, are not permitted to possess electronic appliances. (ECF 34, p. 9).

Likin also interviewed Officer Ryan Harper, who said he was asked by Snyder on December 25, 2013, to search Sloan's wheelchair because there had been pieces of the heater lying on the cell floor. (ECF 34, Ex. 10, p. 8). Harper helped pick Sloan up from the wheelchair and laid him on the floor. He denied observing Davis pushing Sloan's face into the cage. He also denied assaulting Sloan or observing anyone else assaulting him.

Sgt. Christopher Bingaman told Likin that he was present during the strip search. He observed Harper and Snyder remove Sloan from the wheelchair and lay him on the floor. He did not observe Davis push Sloan's face into the cage or anyone otherwise assault Sloan. (ECF 34, Ex. 10, p. 9).

Likin noted there is no record that Sloan complained to medical staff about being thrown to the floor. The investigation concluded there no evidence to support Sloan's claim of assault and recommended closing the case. (ECF 34, Ex. 10. p. 11).

<u>Declaration of Officer Jason Lee</u>

Officer Jason Lee ("Lee") states that on November 11, 2013, he observed Sloan banging on his cell door window with the leg rest of his wheelchair. (ECF 34, Ex. 1). Lee ordered Sloan to stop, but Sloan did not comply. Lee then applied a short, one-second burst of pepper spray to Sloan's face and called for assistance. *Id.* Linn and Davis responded and escorted Sloan to the medical unit. Lee meanwhile reported the incident, completed a notice of inmate rule violation, and returned to his duty station. *Id.* Later that evening, Sloan was placed in a behavioral management cell to de-escalate the behavior and allow him to calm.[19] Lee declares:

---

[19] The behavioral/staff alert cell is used to de-escalate and calm an inmate who has presented danger to himself, staff, or the institution. (ECF 34, Ex. 6, p. 7). The cell contains a functioning sink and toilet. (ECF 34, Ex. 7.) For security purposes, there is no bunk. Inmates placed in the behavioral/staff alert cell are permitted one undershirt, one pair of undershorts, and a pair of socks. Sanitation and hygiene items are provided based on inmate need. Inmates in this status are monitored twice an hour by an officer. Medical staff and a custody supervisor also observe the inmate at least once during an eight-hour shift. *Id.* A lieutenant or designee evaluates the inmate to determine

> I had no knowledge of Mr. Sloan's medical conditions. From the time this incident occurred and until I was made aware of Mr. Sloan's allegations, I was unaware that Mr. Sloan identifies himself as an asthmatic. I was also unaware of any prior issues regarding the denial of Mr. Sloan's medication. I did not induce Mr. Sloan to come to the security slot of his cell for medication for the purpose of pepper-spraying him. Furthermore, I neither observed nor was I informed by any officer of any assault and/or use of derogatory names against Mr. Sloan that allegedly occurred subsequent to my involvement in this matter.

*Id.*

### Declaration of Officer Codey Linn

Officer Codey Linn attests that on November 11, 2013, he responded to a radio call for officer assistance and observed that Sloan had been pepper-sprayed. (ECF 34, Ex. 3). Linn assisted in placing handcuffs on Sloan, and then escorted him for medical treatment. Sloan was placed in a holding cell for a brief period until medical staff arrived to unlock the medical room. Sloan was treated for pepper-spray exposure and given a decontamination shower. *Id.* Afterwards, Sloan was placed in a behavioral/staff alert cell. Linn attests:

> At no time did I assault Mr. Sloan, push his head, or call him derogatory names. Furthermore, to the best of my personal knowledge, at no time did I observe Mr. Sloan being pepper-sprayed, choked, assaulted, or called derogatory names by any other officer who responded to this incident.

*Id.*

### Declaration of Officer Clinton T. Davis

Officer Davis attests to escorting Sloan to the medical unit after pepper spray was administered. Sloan was given a decontamination shower, and placed in a behavioral/staff alert cell. Davis denies assaulting or using pepper spray on Sloan. He states:

> At no time did I assault Mr. Sloan, pepper-spray him, push his head, or call him derogatory names. Furthermore to the best of my personal knowledge, at no time did I observe Mr. Sloan being pepper-sprayed, choked, assaulted, or called derogatory names by any other officer who responded to this incident.

---

when removal from the cell is appropriate. Upon removal from the behavioral/staff alert cell, the inmate is seen by medical personnel. *Id.*

(ECF 34, Ex. 4, p. 3.)

In regard to the December 25, 2013, incident, Davis attests Sloan initially refused to arise from his wheelchair so that it could be searched. Sloan subsequently agreed and accepted the officers' assistance. Sloan was removed from the chair and placed outside the strip cage. Once outside the strip cage, Davis offered Sloan a chair which was declined. Davis attests:

> I did not assault, push Mr. Sloan's head, throw Mr. Sloan to the ground, nor did I call Mr. Sloan derogatory names. Furthermore, to my recollection, Mr. Sloan was not thrown to the ground, assaulted, called derogatory names, nor was his head pushed at all during my response to the incident.

> The search of the cell and subsequent strip search, and contraband located, [sic] were the result of Mr. Sloan's destruction of the heater in his cell. The events of December 25, 2013 were not in retaliation for Mr. Sloan's use of the request for administrative remedy process ("ARP") nor pending lawsuit. To the best of my personal knowledge, I was not served with a copy of Mr. Sloan's complaint until after these events had occurred. I also had no knowledge of the ARP Mr. Sloan filed on November 21, 2013.

> On March 24, 2014, at the instruction of Sergeant Bingaman, and out of concern that Mr. Sloan had been hording [sic] and distributing medication on the tier, I conducted a search of Mr. Sloan's cell and discovered 19 pills, 3 intact razors, numerous broken razors, and that Mr. Sloan had broken the right arm of his wheelchair.

> I did not plant contraband in Mr. Sloan's cell. Nor was the search of his cell in retaliation for his utilization of the ARP or judicial process. Rather, the search conducted on March 24, 2014, was a product of legitimate and significant safety and security concerns based on real evidence that Mr. Sloan had been distributing dangerous medications on the tier.

(ECF 34, Ex. 4).

Declaration of William Gordon Jr.

Correctional Lieutenant Gordon attests that on or about April 25, 2014, medical staff indicated it was no longer necessary for Sloan to have a wheelchair in his cell. Instead, Sloan was to have access to a wheelchair only outside of his cell in order to ambulate longer distances.

(ECF 34, Ex. 11).   Gordon states the Division of Correction Case Management Manual, DOC.100.0002, directs an inmate in special confinement shall whenever possible be double celled, unless there are documented reasons to warrant single-cell placement.   Sloan was assigned to a double cell after medical providers determined a wheelchair in his cell was no longer necessary.

Gordon attests that prior to placing Sloan in a double cell, he checked OBSCIS Enemy Alert information to confirm Sloan and Milton Savoy, who would be his cellmate, were not documented enemies. (ECF 34, Ex. 11).

Gordon states that due to bed spacing concerns, the absence of a documented enemy alert, and no known conflicts between Sloan and Savoy, he had no reason to believe that they could not be safely double-celled with each other.   Gordon states at no time did he observe Sloan crawling on the floor bleeding from the head and knees without medical attention, nor were such facts provided to him in writing or verbally.   "Additionally, to the best of my personnel [sic] recollection, at no time has any staff been notified by Mr. Sloan about the allegations raised in his Supplemental Complaint." *Id.*

### Sloan's Medical Records

On November 11, 2013, Nurse Nicole Zacot examined and treated Sloan for exposure to pepper spray. (ECF 34, Ex 5).   The medical record indicates Sloan reported "[m]y eyes hurt cuz of this pepper spray," and he was provided a cold compress. *Id.* at 3.   The examination revealed Sloan's lungs were clear, his respiration was normal and unlabored, and no sign of injury was noted. *Id.*   After a decontamination shower, Sloan was placed in a behavioral/staff alert cell. (ECF 34, Ex. 8, p. 33).   He was removed the following day, November 12, 2013. (ECF 34, Ex. 8, pp. 30-32).

16

On November 11, 23, and 30, 2013, Nurse Dennis Martin delivered medical supplies to Sloan. (ECF 5, pp. 6-9). There is no record that Sloan reported during these visits any medical concerns based on the November 11, 2013, incident or his placement in the behavioral/staff alert cell.

On December 26, 2013, Nurse Dennis Martin examined Sloan during a wellness check-up. Examination showed Sloan had an "old abrasion [to the] right side of face" and no open areas, bleeding, bruising, or swelling. (ECF 34, Ex. 5, p. 12).

## DISCUSSION

### I.   Legal Standards

#### A. Preliminary Injunction

Sloan's claims that he was tortured for fourteen days in a cell without accommodations for his wheelchair, choked and pushed out of his wheelchair by a corrections officer, and deprived of medical care raised concerns about his immediate safety and prompted the court to require an expedited response. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). A plaintiff must show that the irreparable harm he faces in the absence of relief is "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).

For injunctive relief to be granted, the claimant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public

interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 19 (2008).  All four requirements must be satisfied.  *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (*per curiam*).  Under *Winter*, the party seeking the preliminary injunction must clearly show the likelihood of succeeding on the merits. *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

Defendants' expedited response indicated that Sloan did not have a medical need to use a wheelchair.  Further, Sloan's repeated use of his wheelchair to destroy prison property posed safety concerns to institutional security.  Counsel also represented that an IIU investigator had conducted a preliminary investigation, and concluded Sloan was not in imminent danger of harm.  In short, Sloan's conclusional assertions of torture are unsubstantiated and insufficient to justify preliminary injunctive relief.  Under these circumstances, Sloan fails to satisfy the strict requirements set forth in *Winter*, 555 U.S. at 20.  He does not show the likelihood of suffering irreparable harm in the absence of preliminary relief, nor that an injunction is in the public interest.  Further, he does not show the likelihood of succeeding on the merits or that the balance of equities is in his favor, especially given his purposeful destruction of his wheelchair.  As Sloan has not satisfied this standard, preliminary injunctive relief will be denied.

## B. Motion to Dismiss

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotation marks and alterations omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause

of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint is also insufficient if it relies upon "naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (alteration in the original) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." *Id.*; *Twombly*, 550 U.S. at 547. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

In considering a Rule 12(b)(6) motion, the court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "Conclusory allegations regarding the legal effect of the facts alleged," however, need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995) (citing *United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085–86 (4th Cir. 1979)). Because the central purpose of the complaint is to provide the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests, the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response. *Twombly*, 550 U.S. at 555 n.3.

### C. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any

genuine dispute of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1).  Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

Because Sloan is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nevertheless, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation*, 477 U.S. at 323–24)).

## II.    Defendants' Response

Defendants assert failure to exhaust administrative remedies, sovereign immunity, respondeat superior, and qualified immunity as defenses.  Additionally, they argue Sloan's claims fail to amount to claims of constitutional dimension.

### 1. Exhaustion of Administrative Remedies

The Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a), requires inmates to pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004). A claim that has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007). Administrative remedies must, however, be available to the prisoner and the Court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar–Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007).

Defendants argue Sloan failed to exhaust his claims through an available administrative remedy procedure, and provides no reasons to excuse his failure to do so. The court is familiar with the Division of Correction's practice to decline an investigation for an ARP where one is already pending before the IIU. As earlier noted, IIU investigations referenced by counsel were not included in the exhibits filed by Defendants. Thus, in an abundance of caution, Sloan's claims will not be dismissed based on exhaustion grounds.

### 2. Sovereign Immunity

Under the Eleventh Amendment to the United States Constitution, a state, or one of its agencies or departments, is immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Ann. Code, State Gov't. § 12–201(a) (2014 West), it has not waived its immunity under the Eleventh Amendment to suit

in federal court. Thus, plaintiff's complaint against the Division of Corrections, a Maryland state agency, is barred by the Eleventh Amendment.

Further, WCI is not a proper defendant in a § 1983 action, for which a plaintiff must allege injury by a "person" acting under color of state law. *See* 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 & n.55 (1978) (noting that for purposes of § 1983 a "person" includes individuals and "bodies politic and corporate"); *see generally 5 Charles Alan Wright, et al., Fed. Prac. & Proc.* § 1230 (2002). WCI is a building. An inanimate object cannot act under color of state law and is not a "person" subject to suit under 42 U.S.C. § 1983. *See Preval v. Reno*, 203 F.3d 821 (4th Cir. 2000) (affirming the dismissal of a § 1983 claim because a jail is not a "person" and, therefore, not amenable to suit under § 1983). For the above reasons, the Division of Corrections and WCI will be dismissed as defendants.

### D. Respondeat Superior

Section 1983 provides a remedy against any person who, under color of state law, deprives another of rights protected by the United States Constitution. *See* 42 U.S.C. § 1983. Section 1983, however "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)). Thus, it follows that in order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him or her of a constitutional right or of a right conferred by a law of the United States. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (stating that for liability to exist under 42 U.S.C. § 1983, there must be personal involvement by the defendant in the violation alleged). "[A] plaintiff must

plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Sloan does not claim, nor does the record suggest, that Warden Graham was personally involved in the incidents alleged. (ECF 26). Graham's sole involvement was transmitting an investigation report of Sloan's allegations to counsel in the Office of the Attorney General. (ECF 14, Ex. 1). The doctrine of respondeat superior [20] does not apply to claims raised pursuant to a 42 U.S.C. § 1983 claim. *See Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence:  1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and 3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Sloan alleges no facts to support culpability under a theory of supervisory liability, and Warden Graham will be dismissed as a

---

[20]  Respondeat superior is a legal doctrine whereby an employer or principal may be held responsible for its employees or agents.

defendant in this case. Sloan's claims against the remaining defendants will be considered in turn.

### E. Sloan's Eighth Amendment Claims

1. <u>November 11, 2013, Use of Force Incident</u>

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (*per curiam*); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992). Eighth Amendment analysis requires examination as to whether prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

In determining whether prison officials have acted maliciously and sadistically, a court should balance 1) the need for the application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the responsible officials, and; 4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321. Not every malevolent touch by a prison guard, later determined in the calm of a judge's chambers to be gratuitous, gives rise to a federal cause of action. *See Hudson*, 503 U.S. 1, 6

(1992). In *Wilkins*, the Supreme Court stated: "This is not to say the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." 559 U.S. at 37 (quoting *Hudson* 503 U.S. at 7). Thus, a court must look at "the nature of the force rather than the extent of the injury." *Wilkins*, 559 U.S. at 34.

Prison officials are charged with balancing competing governmental interests, such as the maintenance of order; protection of correctional officers, prison staff, and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 321. When correctional officers use force to keep order, they have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6. Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7.

Sloan acknowledges that on November 11, 2013, he was "kinda knockin on the [cell] door to get someone's attention." (ECF 34, Ex. 10, p. 3). When he did not comply with Officer Lee's order to stop, a short, one-second burst of pepper spray was applied. *Id.* Lee attests he was unaware that Sloan identified himself as an asthmatic or had any medical condition to preclude the use of pepper spray. After the incident, Sloan was taken to the medical unit and the behavioral alert cell. The record contains no support for Sloan's bald allegation he was later pepper-sprayed by Davis.

Sloan's actions, including ramming parts of his wheelchair against his cell window, posed threats to institutional security, and the application of pepper spray was a brief and limited use of force intended to maintain prison safety. Sloan was ordered to stop and failed to comply.

The use of pepper spray was tempered as Sloan was removed from his cell, provided a shower, and given medical attention shortly after the incident. Sloan does not satisfy his burden to show defendants applied force maliciously and sadistically for the very purpose of causing harm. The record shows the force was a brief, tempered, and good faith effort to maintain safety and order. Consequently, defendants are entitled to summary judgment as to this claim as a matter of law.

### 2.  December 25, 2013, Use of Force Incident

Sloan's strip search and removal from his wheelchair on December 25, 2013, were necessitated by safety concerns based on the discovery that metal had been removed from the heater in his cell. The record contradicts Sloan's allegations that improper force was used to lift him from his wheelchair so that it could be searched, and in fact contraband was found.

Defendants Davis, Harper, Miller, and Snyder state they did not throw Sloan to the ground. Davis denies pushing Sloan's head into the strip cell cage, and his statement is corroborated by the other officers who were present during the search as well as the medical record. Even when the evidence is viewed in the light most favorable to Sloan, no genuine issues of material fact are presented and defendants are entitled to summary judgment in their favor.

### 3.  Conditions of Confinement Claims

In determining whether conditions amount to cruel and unusual punishment in violation of the Eighth Amendment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). This deference is at its greatest when prison order is at stake. *See In Re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (2003). Poor conditions of confinement do

not necessarily violate the Eighth Amendment to the Constitution; only conditions that "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "The Constitution ... 'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Setter*, 501 U.S. 294, 298 (1991) (citations omitted).

In order to demonstrate cruel and unusual punishment, an inmate must prove two elements:  1) he suffered deprivation of a basic human need that was "objectively sufficiently serious," and 2) "subjectively [defendants] acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).

Insofar as Sloan contends his placement in the behavioral alert cell constituted an abridgement of his rights under the Eighth Amendment, the record shows the time he spent in the special cell was brief, he was frequently monitored, and the purpose of his placement was to deescalate an incident that potentially threatened inmate and staff safety.

To the extent Sloan asserts his placement in a double cell without handicap accommodations constituted unconstitutional conditions of confinement, the record indicates that medical staff reported it was no longer necessary for Sloan to have access to a wheelchair while inside his cell.  Inmates in special confinement are whenever possible double-celled, unless there are documented reasons to warrant single-cell placement.  Lieutenant Gordon states at no time did he observe Sloan crawling on the floor bleeding from the head and knees without medical attention, nor were such facts provided to him in writing or verbally, nor was he aware that staff had been notified by Sloan about the allegations he raised.  In the absence of evidence that

defendants acted with a sufficiently culpable state of mind, they are entitled to summary judgment in their favor.

      4.  <u>Failure to Protect</u>

An Eighth Amendment claim of failure to protect from violence requires a plaintiff to establish that defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir.1987); *see also Farmer*, 511 U.S. at 833–34 (citations omitted). However, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Deliberate indifference is "a very high standard." *Grayson v. Peed*, 195 F.3d 692, 694 (4th Cir.1999). It requires a plaintiff to introduce evidence suggesting that the prison official had actual knowledge of an excessive risk to the plaintiff's safety. *Farmer*, 511 U.S. at 837.

Sloan claims that on April 12, 2014, Sergeant Bingaman saw Sloan, who had just fallen from a chair, bleeding on the floor of his cell, and told him that he wanted Sloan to die. (ECF 15, p. 2). Sloan also avers Bingaman observed the search and did nothing to try to help Sloan. (ECF 26, p. 3). According to Sloan, Bingaman threatened that "if he didn't keep his mouth shut and abandon his prison grievance," that "he would do something very bad to Sloan every single day" (ECF 26, p. 4).[21]

Sloan's allegations of threats are insufficient to state an Eighth Amendment claim. Sergeant Bingaman told the IIU investigator in the report filed with this court that he did not

---

[21] Given these allegations, it is unclear to the court why defendants aver Bingaman had no personal participation in the matters at issue in this complaint, and is entitled to dismissal on this basis. (ECF 34, pp. 22-23).

witness an assault on Sloan. As noted, other defendants have provided declarations stating Sloan was not thrown to the ground, assaulted in the strip cage prior to the search of his wheelchair, or injured, and their statements are supported by the medical record. Simply put, there are no genuine issues of material fact to suggest Bingaman's actions abridged Sloan's constitutional rights or federal law.

Insofar as Sloan may fault defendants for placing him in a cell with an inmate who later assaulted him, Lieutenant Gordon's declaration shows Sloan and his inmate were both vetted to ensure they were not known enemies prior to assigning them cellmate status. Given these circumstances, Sloan does not demonstrate that defendants knew of or disregarded an excessive risk to his safety, and his claims fail to show deliberate indifference necessary to state an Eighth Amendment claim. Accordingly, summary judgment will be entered in favor of defendants as to this claim.

### 5. Denial of Medical Care

In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff members were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer*, 511 U.S. at 837 (1994). Moreover, prison officials are entitled to rely on medical judgments and the expertise of prison physicians and other medical providers concerning the course of treatment deemed necessary for prisoners. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Miltier v. Beorn*, 896 F.2d 848, 854–55 (4th

Cir. 1990) (stating that supervisory prison officials are entitled to rely on professional judgment of trained medical personnel and may be found to have been deliberately indifferent by intentionally interfering with a prisoner's medical treatment ordered by such personnel).

The decision to remove the wheelchair from Sloan's cell was made in consultation with medical professionals who determined a wheelchair was not needed for Sloan inside his cell. According to Lieutenant Gordon, he was unaware of Sloan's allegations of bleeding from the head and knees from crawling on the cell floor, such claims were not provided to him in writing or verbally, and he was unaware that Sloan had informed staff about his concerns. Assuming *arguendo* that Sloan's scrapes amounted to serious need, Sloan does not show that defendants acted with deliberate indifference to these concerns. Accordingly, summary judgment will be entered in favor of defendants as to this claim.

### 6. Retaliation and Threats

Sloan claims defendants wrote rule violations against him in retaliation for his filing of ARPs and complaints against them. In order to prevail on a claim of retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). "'A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone.'" *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)); *Pierce v. King*, 918 F. Supp. 932, 945 (E.D.N.C. 1996) (conclusional allegations of retaliation are insufficient to state claim).

Sloan's allegations that officers threatened him to retaliate against him for filing ARP requests lack factual substantiation. Sloan's admission to Detective Likin, the IIU investigator,

that he had in fact had no problems with Officer Lee after the November 13, 2013, incident, belies such allegations made against Officer Lee. *See supra*, p. 11.

In so far as Sloan asserts Davis searched his cell on March 24, 2014, in retaliation for "writing up" officers, and complains Davis confiscated his medication and gave him a "ticket," Sloan's bare allegations fail to state a claim of constitutional moment. (ECF 10). As noted, prescription medication considered contraband was found in the cell, and there was evidence this contraband was being provided by Sloan to other inmates. Sloan provides no evidence to support his assertion that contraband was planted on him.

Sloan's allegations of name calling and verbal threats fail to amount to a claim of constitutional magnitude. "[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Mere verbal abuse and taunting inmates by guards, including aggravating language, does not state a constitutional claim. *See McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) (stating "acts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment"); *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983") (citing *Collins v. Cundy*, 603 F.2d 825, 82 (10th Cir. 1979); *cf. Hudspeth v. Figgins*, 584 F.2d 1345 (4th Cir. 1978) (stating allegations that a guard threatened to have an inmate killed were sufficient to state a § 1983 claim).[22] As earlier noted, Lee, Linn, and Davis deny calling or hearing other officers call Sloan any derogatory names. Sloan's allegations, even when viewed in the light most favorable to him, fail to suggest genuine issues of material fact, and as such, summary judgment will be entered in favor of defendants as to this claim.

---

[22] The comments purportedly made to Sloan by corrections officers were unprofessional and vile, but alone do not amount to constitutional abridgement.

## CONCLUSION

For the foregoing reasons, Warden Graham, the Division of Corrections, and the Western Correctional Institution will be dismissed as defendants; plaintiff's claim under the Americans with Disabilities Act will be dismissed for failure to state a claim; and summary judgment will be granted in favor of defendants.   This case will be closed by separate order to follow.[23]

_Jan. 20, 2015_
Date

_James K. Bredar_
James K. Bredar
United States District Judge

---

[23] The court need not reach the defense of qualified immunity for reasons apparent herein.